(C. D. 1135)

FRIES BROS., INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided October 27, 1948)

*John D. Rode* for the plaintiff.
*David N. Edelstein*, Assistant Attorney General (*John J. McDermott* and *Richard E. FitzGibbon*, special attorneys), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges

COLE, Judge: Merchandise, described on the invoice as "OIL EUCALYPTUS DIVES 90/95% PIPERITONE," was classified as a chemical compound, not specially provided for, under paragraph 5 of the Tariff Act of 1930 (19 U. S. C. §1001, par. 5), and accordingly assessed with duty at 25 per centum ad valorem. Plaintiff's principal claim is that the merchandise is classifiable as eucalpytus oil under para-

graph 58 of the Tariff Act of 1930 (19 U. S. C. §1001, par. 58), dutiable thereunder at 15 per centum ad valorem. It is alternatively claimed that the product is dutiable either at 12½ per centum ad valorem under said paragraph 58, as modified by the trade agreement with France, 69 Treas. Dec. 853, T. D. 48316, as a distilled or essential oil, not specially provided for, or at 10 or 20 per centum ad valorem under paragraph 1558 of the Tariff Act of 1930, as a nonenumerated article.

The secretary-plant manager of the importing corporation, a chemist with 25 years' experience in the manufacture of synthetic organic chemicals, requiring considerable handling of different types of essential oils, the sole witness for the plaintiff, testified that there are between 20 and 30 kinds of eucalyptus oils, one of which is "Oil of Eucalyptus Dives," obtained from a tree belonging to the eucalyptus family, named "Dives," found in certain sections of Australia. The oil is acquired by putting leaves and twigs, picked at a particular season, into metal stills, and through a process of extraction by steam distillation the oil is condensed and collected. At this point, the oil consists of approximately 50 per centum phellandrene and 40 to 45 per centum piperitone. To remove undesirable phellandrene, the oil is rectified through another process of steam distillation, which produces a concentrated oil consisting of approximately 90 per centum piperitone and 10 per centum other constituents.

A representative sample (illustrative exhibit A) of oil of eucalyptus dives, the merchandise in question, was identified. Testifying from the report of his analysis (plaintiff's exhibit 3), the witness stated that the present merchandise consists of 93 per centum piperitone, the remaining 7 per centum being, for all practical purposes, phellandrene.

The witness testified that the oil of eucalyptus dives in question is an essential oil, which he defined as "an oil derived from vegetable material by steam distillation or possibly by extraction." Like all essential oils, the present merchandise is a mixture of chemical compounds, composed principally of the chemical compound, piperitone, mixed with other natural ingredients, largely phellandrene and possibly a trace of an alcohol.

The process of rectification is one ordinarily followed in treating or manipulating distilled or essential oils. It did not create a new product but merely changed the percentages of the natural ingredients in the oil of eucalyptus dives under consideration, materially reducing the quantity of the useless phellandrene and increasing in volume the valuable piperitone. The oil in question is one of the kinds or classes of eucalyptus oil.

Defendant's only witness was the Government chemist, Dr. Harold B. Meade, employed for 17 years in the United States Appraiser's

laboratory, who analyzed the merchandise. His analysis "did not differ materially" from that reported by plaintiff. He admitted that there are "about 150" varieties of eucalyptus trees and oils, of which oil of eucalyptus dives is "simply one," and knew of no use for the phellandrene naturally embodied in the oil, before processing, although it had been imported in such condition.

Defendant's testimony concerning the process of rectification disagrees with that offered by plaintiff along the same line. Rectification introduces a new product that differs from an essential oil in physical constants and composition. The imported substance was described as "a fractionated product from which the undesired phellandrene for which there is no use has been removed, the piperitone concentrated to a point where it is of commercial value." (R. 29.) The merchandise before us is distinguishable from oil of eucalyptus dives by its "higher gravity, greater solubility, and much greater content of piperitone. The odor is different." (R. 28.) The witness called the product "a technical compound," which he explained as follows (R. 28): "We speak of chemical compounds, pure chemical compounds, pure compounds, 100%. Those are not encountered in commerce. They are always contemplated, almost always, let me say, with other materials depending upon the source from which they are derived or how they are manufactured. 95% of the strength is not a bad strength for a technical chemical. It is a very good technical chemical. That is what I found this product to be."

On cross-examination, the witness admitted the imported merchandise is "not pure piperitone," but also contains other ingredients naturally present in the unprocessed oil.

Defendant's characterization of the merchandise as a "technical chemical compound" is merely a self-styled designation, not consistent with, but rather contrary to, the collector's classification of the merchandise as a chemical compound, not specially provided for, paragraph 5, supra. The admission that the merchandise is a substance of which the major ingredient is piperitone, combined with minor constituents (principally phellandrene), carries the conclusion that the product is in fact a mixture of chemical compounds. Willingness to ignore the presence of phellandrene and "other constituents too," by characterizing the merchandise, "technical piperitone," leads to an erroneous description, concealing the true nature of the product.

A publication (exhibit 1 for identification) titled "Commercial Eucalyptus Oils (Bulletin No. 2)," issued by the Technological Museum of Sydney, Australia, and prepared by A. R. Penfold, a recognized authority on eucalyptus oils, describes the merchandise in question as follows (p. 11):

Rectified Oil of Eucalyptus Dives

Owing to the limited uses which have so far been found for phellandrene, especially outside of Australia, a demand has arisen for an oil richer in piperitone content than the crude oil of *E. dives* which is sold as containing 40–45% of the ketone. Manufacturers using *E. dives* oil for its piperitone content have experienced some difficulty in disposing of their stocks of phellandrene, and moreover, there is the added cost of freight and other charges in connection with its importation.

A rectified oil of *Eucalyptus dives* was thereupon placed on the market early in 1930 by one of the largest Australian handlers.

Plaintiff's proof, coupled with the foregoing authoritative description of the oil of eucalyptus dives under consideration, establishes that the imported substance is an essential oil, and, more specifically, it is one of the kinds of eucalyptus oil.

The provision for eucalyptus oil in paragraph 58, *supra*, is an *eo nomine* designation without limitation. The statutory term is all-embracive, not restricted by words of qualification. On the basis of the present record, the designation contemplates every class or type of eucalyptus oil—and there are numerous varieties—including oil of eucalyptus dives, the merchandise in question. *Nootka Packing Co. et al.* v. *United States*, 22 C. C. P. A. 464, T. D. 47464, expressed the controlling legal principle in this way: "An *eo nomine* statutory designation of an article, without limitations or shown contrary legislative intent, judicial decision, or administrative practice to the contrary, and without proof of commercial designation, will include all forms of such article."

To support defendant's position, counsel, in their brief, cite three cases, *Fritzsche Bros.* v. *United States*, 29 Treas. Dec. 790, Abstract 38963; *New York Quinine & Chemical Co.* v. *United States*, 53 Treas. Dec. 1037, Abstract 6126; and *C. F. Ten Eyck* v. *United States*, 66 Treas. Dec. 890, Abstract 28554. None of them is in point.

The *Fritzsche Bros.* case, *supra*, concerned merchandise "invoiced as eucalyptol," concededly a chemical compound, which the court found not to be an essential oil, as classified by the collector. A claim for classification as a chemical compound was therefore sustained.

In the *New York Quinine & Chemical Co.* case, *supra*, piperitone was held to be classifiable as a chemical compound. The *C. F. Ten Eyck* case, *supra*, held phellandrene to be an odoriferous or aromatic chemical, as classified by the collector, rather than eucalyptus oil, as claimed. From the conclusions in the last two cited cases, counsel for defendant argue as follows:

Surely if eucalyptus oil can be separated into two materials one phellandrene and the other piperitone and one of these parts is not eucalyptus oil, then it necessarily should follow that the other is also not eucalyptus oil.

The proposition advanced by defendant must be based on the premise that the present merchandise is piperitone, a condition not

supported by the record herein. On the contrary, the substance in question, admittedly, consists of piperitone, phellandrene, and other constituents of negligible quantity, all existent in the crude oil, but in quantities different from the percentages found in the imported product.

For reasons hereinabove set forth, we hold the merchandise in question to be classifiable as eucalyptus oil under paragraph 58, *supra*, and dutiable at 15 per centum ad valorem, as claimed.

The protest is sustained and judgment will be rendered accordingly.