UNITED STATES *v.* FRIES BROS., INC. (No. 4615)[1]

United States Court of Customs and Patent Appeals, November 7, 1949

[1] C. A. D. 416.

*David N. Edelstein*, Assistant Attorney General (*Joseph F. Donohue* and *Alfred A. Taylor, Jr.*, special attorneys, of counsel), for the United States.
*John D. Rode* for appellee.

[Oral argument October 6, 1949, by Mr. Donohue and Mr. Rode]

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, and JOHNSON, Associate Judges

JACKSON, Judge, delivered the opinion of the court:

Appellee imported at the Port of New York merchandise invoiced as "Oil Eucalyptus Dives 90/95% Piperitone," which was classified by the collector as a chemical compound not specially provided for pursuant to paragraph 5 of the Tariff Act of 1930 and duty was accordingly assessed thereon at 25 per centum ad valorem.

Protest was filed against the said classification, claiming the merchandise to be properly classifiable as eucalyptus oil under paragraph 58 of the said act and dutiable thereunder at 15 per centum ad valorem. Other claims were made in the protest but they are not relied on here.

The suit was tried in the city of New York before the United States Customs Court, First Division, which by judgment duly given in accordance with its decision, 21 Cust. Ct. 93, C. D. 1135, sustained the protest of appellee, and held that the imported merchandise was properly dutiable at the rate of 15 per centum ad valorem as eucalyptus oil.

The record consists of the testimony of the secretary-plant manager of appellee, appearing in its behalf, and the testimony of a Government chemist employed in the United States Appraiser's laboratory, for appellant. A representative sample of the imported merchandise was received in evidence as an illustrative exhibit. Analyses of the goods, one by each of the witnesses, were also received in evidence.

Appellee's witness was a duly qualified chemist who had twenty-five years experience in the making of synthetic organic chemicals which involved the use of different kinds of essential oils. He testified that there are between 20 to 30 kinds of eucalyptus oils, one of which is known as "oil of eucalyptus dives" obtained from the tree designated as "dives," which belongs to the eucalyptus family and grows in certain sections of Australia.

Oil of eucalyptus dives is obtained from the leaves and twigs of the tree gathered at a certain season of the year and subjected to a process of extraction by means of steam distillation. The product comprises about 50% phellandrene and 40 to 45% piperitone. That oil, it is agreed, has no commercial value, at least we so infer for the reason that the witness for the Government stated he knew of no commercial use for such oil.

After the oil has been produced as aforesaid, it is subjected to a rectification process of steam distillation, the result of which is a con-

centrated oil containing approximately 90% piperitone and 10% of other constituents.

The witness for appellee testified that the imported merchandise is an essential oil for which he gave a definition as "an oil derived from vegetable material by steam distillation or possibly by extraction." It appears from his testimony that the involved oil, like all essential oils, is a mixture of chemical compounds being composed of its chief constituent, piperitone, mixed with other natural ingredients, largely phellandrene and also a trace of alcohol.

The witness stated that the process of rectification which resulted in producing the involved merchandise is the process usually followed in the treatment of distilled or essential oils and that no new product was created by reason of said rectification, but that the percentages of the natural ingredients in the crude oil were changed in that the phellandrene, which seemingly is useless, was materially reduced in quantity thereby increasing in volume, piperitone, which is a useful and valuable constituent in the imported oil. The witness stated unequivocally that the imported merchandise was one of the eucalyptus oils, and that different kinds of such oils are used for distinct and different purposes.

The record on behalf of appellant, as far as concrete facts are concerned, does not differ materially from that stated by the witness for appellee. The analyses of the two parties do not differ materially, as is conceded, and the process of rectification is approximately the same.

The Government chemist, however, testified that the rectification of the crude eucalyptus oil dives results in a new product differing from the crude oil in physical constants and composition. He described the imported merchandise as being "a fractionated product from which the undesired phellandrene for which there is no use has been removed, the piperitone concentrated to a point where it is of commercial value." The witness stated that the crude oil of eucalyptus dives may be distinguished from the imported merchandise by reason of its higher gravity, greater solubility, and much greater content of piperitone. He called the imported goods "a techincal compound" and when called upon to explain what he meant by such term, stated as follows:

We speak of chemical compounds, pure chemical compounds, pure compounds, 100%. Those are not encountered in commerce. They are always contemplated, almost always, let me say, with other material depending upon the source from which they are derived or how they are manufactured. Ninety-five percent of the strength is not a bad strength for a technical chemical. It is a very good technical chemical. That is what I found this product to be.

The witness admitted under cross examination that the imported merchandise is not pure piperitone, but that it contains other ingredients naturally present in the unrectified oil.

The trial court deemed the expression "technical chemical compound" to be merely a self-styled designation, stating that it was contrary to the collector's classification as a chemical compound not specially provided for.

The trial court took judicial notice of a statement in a publication entitled *Commercial Eucalyptus Oils (Bulletin No. 2)*, prepared by A. R. Penfold, a recognized authority on eucalyptus oils and issued by the Technological Museum of Sydney, Australia. That publication is known as exhibit 1 for identification, and was said to be authoritative on the subject of eucalyptus oils. The court quoted from the publication as follows:

#### · Rectified Oil of Eucalyptus Dives

Owing to the limited uses which have so far been found for phellandrene, especially outside of Australia, a demand has arisen for an oil richer in piperitone content than the crude oil of E. *dives* which is sold as containing 40–45% of the ketone. Manufacturers using E. *dives* oil for its piperitone content have experienced some difficulty in disposing of their stock of phellandrene, and moreover, there is the added cost of freight and other charges in connection with its importation.

A rectified oil of *Eucalyptus dives* was thereupon placed on the market early in 1930 by one of the largest Australian handlers.

The court then held that the evidence offered by appellee coupled with its judicial notice, as aforesaid, established that the imported merchandise is an essential oil, being one of the kinds of eucalyptus oil. It applied the doctrine announced in the case of *Nootka Packing Co. et al.* v. *United States*, 22 C. C. P. A. (Customs) 464, T. D. 47464, wherein it was stated:

* * * an *eo nomine* designation of an article, without limitations or a shown contrary legislative intent, judicial decision, or administrative practice to the contrary, and without proof of commercial designation, will include all forms of such article.

In the brief of counsel for appellant, it is contended that the imported oil is not a rectified oil of eucalyptus dives, but that it is a chemical compound, as was classified by the collector. While the rule in the *Nootka* case, *supra*, is stated by counsel for appellant to be settled law, it is argued as not being applicable to the facts in the case at bar unless it be found that the imported merchandise is a variety of eucalyptus oil.

We find no error in the reasoning of the trial court. It clearly appears that all of the constituents naturally contained in the oil when first distilled from the leaves and twigs of the tree are present in the imported oil. The only difference between it and the oil as first distilled is a difference in percentages of the constituents. Surely merely rectifying an essential oil only to the degree of changing the proportions of its constituents can not destroy the identity of the original substance. Such oil as that in the case at bar, oil of eucalyp-

tus dives, under the doctrine of the *Nootka* case, *supra*, is entitled to classification as claimed by appellee. Indeed to hold with counsel for the Government it would be a matter of conjecture as to where and when the identity of eucalyptus oil is lost by reason of the change in the percentages of its constituent parts.

For the reasons hereinbefore set out, the judgment of the United States Customs Court is *affirmed*.

By reason of illness, HATFIELD, Judge, was not present at the argument of this case and did not participate in the decision.